# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| GLENN BROWN & BETSY BROWN,<br> *Plaintiffs*, | § § § | |
| v. | § § | CIVIL ACTION H-9-1148<br>LEAD CASE |
| CONTINENTAL AIRLINES, INC,<br> *Defendant*. | § § § | |

| | | |
|---|---|---|
| THE CONTINENTAL PILOTS RETIREMENT<br>ADMINISTRATIVE COMMITTEE, *et al*,<br> *Plaintiffs*, | § § § § | |
| v. | § § | CIVIL ACTION H-9-1529<br>MEMBER CASE |
| GLENN BROWN, *et al.*,<br> *Defendants*. | § § § | |

## ORDER

Pending before the court is the motion of member case defendants Glenn Brown *et al.*'s ("Pilots") to dismiss the complaint of plaintiffs The Continental Pilots Retirement Plan Administrative Committee and Continental Airlines, Inc.'s ("Continental"). Dkt 7.[1] Upon consideration of the motion, the response, the reply, and the applicable law, the motion is GRANTED, and Continental's claims for equitable relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* are DISMISSED WITH PREJUDICE.

## BACKGROUND

According to the facts pled by Continental—which the court accepts as true for the purposes of this motion to dismiss—this case is based on improper payment of benefits from a retirement plan

---

[1] All references to docket entries concern the member case, No. 9-1529, unless otherwise noted.

facilitated by a group of senior pilots' "sham divorces" and resulting domestic relations orders. Dkt. 1. The Continental Pilots Retirement Plan (the "Plan") is an employee benefit plan under section 1002(2)(A) of ERISA. In 2005, a series of senior pilots became concerned about the health of the Plan. These pilots had already reached retirement age, but had not retired or been otherwise separated from their employment at Continental. They, therefore, allegedly engaged in a scheme to obtain their money through the exception to the anti-alienation provision of ERISA for divorce.

The pilots in question all obtained divorces from various states with domestic relations orders ("DRO") that assigned 100% (in one case 90%) of their retirement benefits under the Plan to their spouses—the alternate payees. The Continental Pilots Retirement Plan Administrative Committee (the "Administrator") "qualified" the DRO's and because the pilots in question were of retirement age when the alternate payees requested a lump sum disbursement, the Plan paid the benefits. Some payments were up to $900,000.00. Eventually, it came to the notice of the Administrator that these pilots had obtained divorces for the specific purpose of withdrawing their pensions early. The facts show—and the pilots do not seem to contest—that the pilots and their former spouses did not behave in a manner consistent with the breakup of a marriage. Many of the pilots continued to cohabitate, remarried soon after obtaining the lump sum payout, and all essentially conducted themselves as if the divorce had never happened. In many instances they did not inform any of their family or friends that they had gotten a divorce. The Administrator immediately stopped "qualifying" DRO's that were in process and indicated similar facts. Additionally, it commenced an action in this court seeking equitable remedies from the pilots who had received the payments—equitable lien/equitable restitution to retrieve the money it claims was erroneously paid, and a constructive trust.

**MOTION TO DISMISS**

Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails to state a claim

upon which relief may be granted. FED. R. CIV. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955 (2007). In considering 12(b)(6) motions, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings when determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)) (internal citations omitted). And, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 (supporting facts must be plausible—enough to raise a reasonable expectation). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974).

## ERISA

**1. Standard of Review**

The Plan gives its Administrator discretionary authority to construe the Plan terms. *See* Dkt. 7, Ex. 3 ¶ 12.2. Therefore, the court will set aside the Administrator's interpretation of the plan terms only upon a finding that the interpretation is arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989). However, the court affords no such deference to the Administrator's interpretation of controlling law and statutory interpretation. *Penn v. Howe-Baker Engineers, Inc.*, 288 F.2d 1096, 1100 (5th Cir. 1990). "The interpretation of ERISA

itself must be made de novo by the court." *Id.* Accordingly, the question of whether ERISA grants the Administrator the ability to consider the good faith of the divorce when qualifying a DRO will be made de novo.

Additionally, the Fifth Circuit has described a qualified domestic relations order ("QDRO") as "a separate judicially approved contract between [the plan participant and the non-participating spouse] which the Plan administrator has no special discretion to interpret." *Matassarin v. Lynch*, 174 F.3d 549, 563 (5th Cir. 1999); *but see id* (adding that a court allows "a plan administrator discretion to determine whether an agreement constitutes a QDRO under the plan"). Therefore, if called upon to review the Administrator's finding that the divorces were shams, the court affords no deference to the Administrator's determination.

## 2. Anti-alienation and the Qualified Domestic Relations Order

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S. Ct. 2890 (1983). In furtherance of this goal, §1056(d) of ERISA includes a "spendthrift" provision requiring that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. §1056(d). The Supreme Court has described this provision as "a considered congressional policy choice, a decision to safeguard a stream of income for pensioners . . . and their dependants . . . ." *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376, 110 S. Ct. 680 (1990).

However, in 1984, Congress enacted the Retirement Equity Act amending ERISA and adding, among other things, an exception to the anti-alienation provision for a domestic relations order resulting from a divorce between an employee and a non-participating spouse. *See* Retirement

4

Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426 (codified as amended in scattered sections of 29 U.S.C.). ERISA defines a DRO as

> [A]ny judgment, decree, or order (including approval of a property settlement agreement) which--
>
> > (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
> >
> > (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. §1056(d)(3)(B)(ii). In order for a DRO to allow alienation of plan funds, the Administrator must qualify it. §1056(d)(3)(A). A QDRO is specifically defined by the statute.

> [T]he term "qualified domestic relations order" means a domestic relations order--
>
> > (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
> >
> > (II) with respect to which the requirements of subparagraphs (C) and (D) are met.

§1056(d)(3)(B)(i). The requirements of subparagraphs (C) and (D) address the specificity of information regarding the alternate payee, and whether the DRO would allow benefits not available under the plan or in conflict with another alternate payee respectively.

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies--
>
> > (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> >
> > (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

> (iii) the number of payments or period to which such order applies, and
>
> (iv) each plan to which such order applies.
>
> (D) A domestic relations order meets the requirements of this subparagraph only if such order--
>
> > (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
> >
> > (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
> >
> > (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

§1056(d)(3)(C)-(D). Once a DRO is determined to be a QDRO, the plan "shall provide for the payment of benefits in accordance with the applicable requirements" of the now-qualified DRO. §1056(d)(3)(A).

The Plan defines a QDRO as "any order determined by the Administrative Committee to be a qualified domestic relations order within the meaning of Section 414 of the [Internal Revenue] Code." Dkt. 7, Ex. 3 ¶ 1.70. The definition of a QDRO in the Internal Revenue Code is identical to the definition in ERISA. *Compare* 26 U.S.C. §414(p)(1)-(3) *with* 29 U.S.C. §1056(d)(3)(B)-(D). Additionally, the Plan contains its own version of a spendthrift provision which provides an express exemption for QDRO's. Dkt. 7, Ex. 3 ¶ 17.7(a)-(b).

## APPLICATION

The Pilots move the court to dismiss Continental's claims for equitable relief because (1) Continental has not and cannot point to any provision of ERISA that the Pilots have violated, (2) Continental has not pled specific factual allegations regarding each pilot sufficient to meet the pleading requirements under Rule 8, and (3) Continental seeks monetary damages not available to

6

it under ERISA. Dkt. 7. Additionally, the Pilots argue that Continental improperly asks this court to review and set aside state court divorce judgments over which it has no jurisdiction. And, they contend that the Administrator cannot now revoke its previous determination that the DRO's are qualified.

In response, Continental argues that it has a fiduciary duty to all of the other Plan participants to retrieve monies improperly paid out of the Plan, including the reexamination of the qualification of the Pilots' DRO's. And, it claims the remedies it seeks are equitable in nature and therefore allowable under ERISA. Moreover, Continental contends that jurisdiction is proper here, because it does not seek to have the divorces invalidated. Rather, Continental urges the court to incorporate the "sham transaction" doctrine into ERISA, allowing it to ignore the DRO's for the purposes of determining eligibility for benefits under the Plan.

All of the foregoing arguments hinge on the question of whether §1056(d) gives the Administrator the authority to refuse to qualify a DRO based on criteria not present in the statute. For several reasons, the court finds that under the plain language of the statute, the Administrator may not refuse to qualify a DRO except based on reasons enumerated in the statute. And, the court further finds that the motivation or good faith of the divorce and resulting DRO is not an enumerated requirement. Therefore, Continental may not refuse to qualify or retroactively disqualify DRO's that meet the specific criteria set out by Congress.

The language of the statute is unambiguous. An agreement meeting the definition of a DRO in §1056(d)(3)(B)(ii) must be qualified if it meets the criteria for a QDRO stated in §1056(d)(3)(B)(i), including the requirements listed in §1056(d)(3)(C) and (D). None of those criteria involves the good faith of the divorce. And, none of the requirements includes a catchall provision that would allow an Administrator to evaluate criteria not specifically listed. In ERISA

7

itself, Congress has illustrated its ability to provide the flexibility of a catchall provision. *See Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065 (1996) (describing §1132(a)(3) as a catchall enforcement provision in ERISA). Additionally, the statute does not provide any ability for the Administrator to set additional criteria for qualifying a DRO. Instead the statute allows the Administrator to "establish reasonable procedures to determine the qualified status of domestic relations orders." §1056(d)(3)(G)(ii). But, setting procedures for determining status and setting criteria that determine status are two quite different things. While, the discretion of the Administrator with regards to qualifying a DRO has yet to be examined by the appellate courts, the Supreme Court in dicta this year quoted the Seventh Circuit's description—also in dicta—of the qualifying criteria listed in the statute as a "checklist". *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, ___U.S.___, 129 S. Ct. 865, 876 (2009) (quoting *Metropolitan Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1084 (7th Cir. 1994) (Posner, J.)). Continental contends that the reason the Administrator refused to qualify or retroactively disqualified these DRO's is based on one of the enumerated criteria. Subsection D requires that in order to be qualified a DRO must "not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." §1056(d)(3)(D). It claims that because a plan does not provide for payment of a lump sum based on a sham divorce, to qualify a sham DRO would essentially require the Plan to provide a benefit not otherwise provided. In other words, Continental argues that it can refuse to qualify the DRO, because the DRO would not be qualified. This somewhat circular argument fails, because it starts from the premise that the divorce is a sham which the Administrator is not allowed to consider when qualifying the DRO. To stretch this subsection to include criteria other than whether the actual terms

of the DRO direct the Plan to pay money to which the participant himself would not be entitled, would be to insert a catchall provision in ERISA that Congress did not provide.[2]

Continental also argues that to confine the Administrator to the plain language of the statute would thwart the policy of ERISA by elevating form over substance, and open a floodgate of bad faith DRO demands on the Plan—and every other plan in the country. However, the court cannot ignore the unambiguous language of the statute. The court certainly does not condone the Pilots' alleged actions of engaging in these divorces for the sole purpose of obtaining DRO's that would allow immediate access to their pension funds. But, "vague notions of a statute's 'basic purpose' are nonetheless inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261, 113 S. Ct. 2063 (1993) (emphasis in original) (refusing to allow damages not specifically enumerated in ERISA and preempting state law remedies that would have allowed these damages).

Moreover, the court is not entirely convinced that disbursing retirement funds to the non-participating spouse thwarts one of the purposes of ERISA. One purpose of ERISA is to protect the interests of plan participants and beneficiaries. §1001(a). Continental argues that to allow a plan participant to withdraw funds damages all the other plan participants. While it is true that subtracting from the corpus of the trust can reduce the trust's ability to grow at the same rate, it is equally true that the very people for whom the funds are safeguarded are the people who have withdrawn the funds. And, the non-participating spouses submitted the DRO's when the participants had reached retirement age, not before. Therefore, except for the fact that the Pilots continued to work—although they have since been terminated by Continental—ERISA has protected those

---

[2] It is unclear from the pleadings and the Plan whether the Administrator could have simply refused to pay the lump sum disbursement to the alternate payees until the participant actually retired.

Congress intended it to protect. Accordingly, the court declines to read into the statute criteria Congress did not include.

## Conclusion

Pending before the court is the Pilots' motion to dismiss Continental's complaint. Dkt 7. Because the court finds that the plain language of the statute does not afford the Administrator discretion to refuse to "qualify" a DRO based on criteria not specifically enumerated in §1056(d)(3), the motion is GRANTED, and Continental's claims for equitable relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* are DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on October 19, 2009.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY